LAND, J.
The defendant was convicted of manslaughter and sentenced to serve not less than seven, nor more than ten, years in the state penitentiary. For reversal of the verdict, and sentence against him, he relies upon five bills of exception.
Bill of Exception No. 1.
Defendant challenged the juror William C. Lett, while he was being examined on his voir' dire, on the ground that he was incompetent and not a fair and impartial juror, which objection was overruled by the court for the following reasons, as shown by the per curiam of the bill of exceptions:
“It is evident from the examination of the juror that such opinion as he had formed from hearsay will not weigh with him in reaching a verdict. In any event, the defendant was not prejudiced by the acceptance of the juror by the court for the reason that after the jury was complete the defendant had remaining to his credit four peremptory challenges.”
Overruling defendant’s challenge for cause, where juror has shown himself incompetent on his voir dire, and requiring defendant to exhaust his last peremptory challenge, is reversible error. State v. Guillory, 146 La. 435, 83 South. 754. But erroneous refusal to sustain challenge for cause to juror is harmless where peremptory challenges were not exhausted. State v. Farris, 146 La. 523, 83 South. 791.
[1] As defendant had to his credit four peremptory challenges, after the jury was completed, he was not compelled to accept any unfair or prejudiced juror, and has suffered no injury, even if the ruling of the trial judge had been erroneous.
*925 Bills of Exception Nos. 2 and 3.
While E. T, Curry, a witness for the state, was being interrogated on direct examination, the following questions were asked by the attorneys representing the prosecution:
“Q. Did you raid Johnson’s place for whisky that evening?”
Counsel for defendant objected to this question for the reason that it is irrelevant to the issues of the case, that it has a tendency to highly- prejudice the defendant in the case in the minds of the jury, and is offered to prove another offense. The objection was overruled, and bill reserved. The witness answered:
“I was with them in th'e raiding.”
Continuing the examination, counsel for the state propounded the following question to this witness:
“What did you find?”
This was objected to for the same reasons, and objection overruled. The witness answered :
“We found a pint of whisky, and then two quart fruit jars with — I suppose wasn’t more than half a pint in them, and then up in his place they found, we found a stack of cards, and poker chips. That was up where he was living, upstairs.
“Q. If anything, what did you find in the back of the shop?”
Question objected to, as there was no search warrant, and evidence was therefore illegally obtained, and inadmissible. Objection overruled for the reason that it is admissible in the state district court under our law, although not in the federal court.
“Q. What did you find in the back part?
“A. That is where they found the whisky.”
The judge a quo assigns in his per curiam to this bill the following reasons for his ruling: .
“The court allowed the questions to be answered, and overruled the objection of the defendant for the following reasons,: It was the state’s theory of the homicide that the defendant killed the deceased,' who was the town marshal, because the latter intended to raid the barber shop of defendant as a blind tiger. Prior to the offering of the evidence now objected to, the state placed two detectives on the stand, who testified that defendant admitted to one of them in the hearing of the other that he killed the deceased because he thought that deceased was going to raid' his 'place. We think that evidence that defendant’s place was actually raided after the homicide, but on the same day, with the result as shown by the evidence, is corroborative of the state’s theory of the motive for the homicide.”
As bill of exception No. 3 relates to similar subject-matter, we have decided to consider it in connection with bill of exception No. 2.
J. A. Talbert, a witness for the defense, was on the stand, and was asked on cross-examination by the attorneys for the prosecution the following questions:
“Q. Doctor, you' are mayor of Moorings-port? • -
“A. Yes, sir.
“Mr. Stephens, the deceased, was the city marshal at the time of his death?
“A. Yes, sir.
“Q. Ask you if, some few days before the trouble, Mr. Stephens, the city marshal, called on you, and asked you for a search warrant to search the defendant’s property as a blind tiger?”
Counsel for defendant objected to the question as irrelevant, as it had no bearing on the issues of the case, and that it is prejudicial to the defendant. Objection was overruled for the same reasons assigned in per curiam of bill of exceptions No. 2.
“A. Yes, sir.
“Q. Did call on you for that search warrant?
“A. Yes, sir.
“Q. How long before was that?
“A. He came to me about three times; the last time was the day before the killing.”
' While the trial judge in his per curiam refers to the statement made by the defendant to the two detectives as “an 'admission,” such statement in law is an acknowledg *927 ment of defendant’s guilt and is therefore a confession, and not an admission, which in criminal matters relates to matters of fact that do not involve a criminal intent. Whart. Crim. Ev. (10th Ed.) .p. 12GG.
[2] The confession of the defendant that he killed deceased to prevent defendant’s place from being raided was admitted in evidence, and went to the jury in this case without objection. This confession is proof, not only of defendant’s motive, but of his intent. Defendant pleaded self-defense. His confession refutes such plea, and shows that the homicide with which he was charged was both willful and felonious, and the burden rested upon the state to make this proof in order to convict the accused of manslaughter, the offense with which he is charged. Such testimony was admissible as testimony in chief by the state, as an accused person relying on self-defense does not have the burden of proving that the killing was justifiable, but the state has the burden of proving beyond a reasonable doubt that the killing was not justifiable. State v. Ardoin, 128 La. 14, 54 South. 407, Ann. Cas. 1912C, 45; State v. Varnado, 128 La. 883, 55 South. 562; State v. Herring et al., 131 La. 972, 60 South. 634. With the confession of the defendant that he killed deceased to prevent him from raiding defendant’s place in evidence, and before the jury, without objection to its admissibility, or effect, the trial judge correctly ruled that testimony to show that, a short time before the homicide, deceased had sought to obtain a search warrant from the mayor of Mooringsport, and that testimony to prove that intoxicating liquor and gambling paraphernalia were found in defendant’s place on the day of the homicide, and after the commission of 'same, was admissible in evidence to corroborate the state’s theory of the motive of the homicide.
In the case of State v. Jones, 145 La. 340, 82 South. 362, this court said:
“The objections to the testimony, made on behalf of defendant, were that the state was attempting to prove the commission by him of offenses other than that for which he is prosecuted. But the testimony objected to was clearly admissible as tending to prove defendant’s motive or intent with respect to the offense charged, and the fact that it may incidentally * * * have proved some other offense afforded no reason for its not being permitted to serve the purpose for which, being admissible, it was offered.”
The McGarrity Case, 139 La. 430, 71 South. 730, cited in defendant’s brief, bears not the slightest analogy to the ease at bar, as in the McGarrity Case, in which there were several eyewitnesses to the homicide, evidence of previous threats on the part of the accused was hold to be inadmissible, whether offered to prove the intent to provoke a diffi.culty, or to show who was the aggressor. In the present ease the state has offered no proof of any previous throats made by the accused for any purpose, but it has offered the confession of the accused, made after the commission of the homicide, to prove that the killing was willful and felonious and the motive of the accused for the commission of the crime, together with testimony of corroboration as to defendant’s motive.
Bill of Exception No. 4.
During his arguments before the jury, one of the state’s counsel, as shown by the per curiam of this bill, referred to the daughter of the deceased, whom he said had been bereft of a father, and he feared had been deprived of a means of education' and support. Immediately upon objection being made by the counsel for the defense and before permitting counsel for the prosecution to continue with the argument, the court instructed the jury as follows:
“You are the sole and exclusive judges of the evidence that has- been adduced in this case. The court is not permitted to comment on the facts, to state to- you what facts have been proved, and what facts have not been proven; but at this time we caution you to *929 ■weigh carefully the remarks of the counsel for the state with reference to the facts, and determine for yourself whether or not the evidence is coVrectly quoted or the remarks properly and logically deductible from the established facts.”
[3] The trial judge in his per curiam states that it was proven that the deceased had an eleven year old daughter, and that he did not believe that injury resulted to the accused from the remarks objected to by his counsel. We concur with him in this view. Members of the jury are presumed to have been men of average intelligence, and such words could have had no effect upon them.
Bill of Exception No. 5.
Defendant filed a motion for a new trial setting forth the alleged misconduct of E. A. Chapman, one of the jurors who had tried the case. Said motion avers that said Chapman, notwithstanding the fact that he said that he was not prejudiced in the case and would make a fair and impartial juror, on the first day of the trial told the wife of Harry Stephens, the person whom Johnson was charged with having slain, that he would do all that he could for her, and that the said Chapman made this statement to her after he had been accepted as a juror in the case.
O. M: Flannigan, a witness for defendant on the trial of the motion for a new trial testified that, on the first day of the trial, and after 5 o’clock, when the court had been dismissed for the day, he saw the juror E. A. Chapman speak to Mrs. Stephens, wife of the deceased, in the courtroom, near a door, and that he said that he would do all that he colild do for her. Both Chapman and Mrs. Stephens deny that any such conversation took place, or that any conversation of any kind took place between them on that occasion. Mrs. Stephens further stated that she was with her two sisters all the time during the trial.
Mrs. J. L. Sharp, one of Mrs. Stephen's sisters, testified that she recalled the afternoon of Tuesday, the first day of the trial, when the court adjourned before the jury had been completed and only nine jurors had been selected, that she and her other sister walked with Mrs. Stephens from the courthouse that afternoon, that she did not see Chapman at all after court was over, and did not hear him make any statement at all to her sister Mrs. Stephens.
[4] In the face of such overwhelming testimony, we are of the opinion that the testimony of C. M. Flannigan, witness for defendant on the trial of the motion for new trial, should not be accepted as of any weight.
Defendant also alleges in his motion for u new trial that the said juror Chapman, on the second day of the trial, left the courthouse arm in arm with one Ware, who appeared as a witness for the prosecution, and who was very active against defendant in the trial of the case, and that the said Ware and the said Chapman were in close conversation as they left the courthouse, and went together to the Cosmopolitan restaurant, in the city of Shreveport, and to a secluded part of the restaurant.
[5] Defendant called A. N. Adcock, H. I. Moore, and Guy Armstrong on this part of' the case as witnesses. Neither of these witnesses testified to anything that was said by Ware and Chapman to each other. They merely saw them together, and in conversation, which was proven by Chapman and Ware to be about Chapman’s fast driving-to get to court in time. It is established beyond dispute that Chapman and Ware went to the restaurant accompanied by Barry and Linsey, all of whom dined together, and not one word was said about the case against Johnson. As these four men lived at Mooringsport and were acquainted with each other, it was a very natural thing for *931 them to dine together. There was nothing suspicious about it.
Defendant also charges in his motion for a new trial that the juror Chapman, after having been sworn as a juror in the case, and while riding in an automobile going from Shreveport to Mooringsport, said that Mr. Foster (the attorney representing the defendant in this case)'did not question him much, and that he was sure that if he had questioned at length that he would not have taken him (Chapman) on the jury. In the motion for a new trial it is set forth that neither the defendant nor his attorney knew of these facts until after the trial and conviction.
L. J. Cole, witness for defendant, on the trial of the motion for a new trial stated that, while he was in a Ford car with Chapman about three miles this side of Moorings-port, La., and between 6 and 7 o’clock Tuesday evening, after the first day of the trial, he heard Chapman say that Mr. Foster did not question him as close as he did the other fellows, and if he had he was sure he would not have had him on the jury.
Mr. Chapman, sworn as a witness for the state, stated that he had said to Mr. Cole:
“I didn’t think Mr. Foster would have taken me if he had questioned me closely, because I lived in that neighborhood between Moorings-port and Oil City.”
The witness states that this is the only reason that he assigned. These were the only witnesses to this conversation, and Chapman clearly meant by his statement to Cole that, if he had been questioned more closely, the attorney for Johnson would have discovered that he lived in a neighborhood near the scene of the homicide, and for that reason would not have accepted him on the jury.
The defendant in a supplemental motion for a new trial sets forth that one of the jurors, E. H. Gleason, stated before he was accepted as a juror, and on the first day of the trial, that he would not be accepted as a juror, and that from what he had heard Johnson shot Stephens down in cold blood, and that Gleason on his voir dire stated that he had not formed an opinion, and that there was no reason why he should not give Johnson a fair and impartial trial.
The defendant placed F. E. Williamson on the stand, and he stated that Gleason in a conversation with him had said:
“I don’t know much about it, haven’t heard much about it, but from what I have heard somebody say that fellow shot that man down in cold-blooded murder.”
[6] What the juror Gleason knew about the case was mere hearsay, and, as he had stated on his voir dire that he had formed no opinion and that there was no reason why he should not give Johnson a fair and impartial trial, he was a competent juror.
The defendant in a second supplemental application for a new trial sets forth that one Le Seur testified that he was on the street, and saw Johnson shoot Stephens, whereas in truth and in fact he did not see Johnson shoot him, as was shown by the fact that Le Seur asked one Granville Divers soon after the shooting who it was that shot Stephens.
[7] The lower court overruled the motions for a new trial by the defendant for the following reasons: ■
(1) “A reading of the evidence attached to the bill makes it so clear that the attack on Juror Chapman is unfounded and without merit that we consider further comment unnecessary.”
(2) “It seems from the evidence of Williamson (page 9 of the evidence), and the evidence of the juror Gleason (page 19), that Gleason had formed no opinion of Ms own, but had heard others say that Stephens was murdered. We feel' confident that the juror on Ms voir dire stated the exact truth, and we believe that he was as fair and impartial a juror as entered the box. A poll of the jury showed 11 for conviction, and 1 for acquittal.”
(3) “New trials are not granted for the purpose of impeaching a witness. In this case, *933 though the witness Le Seur was impeached, it would not benefit the accused, as the evidence of other eye-witnesses to the same state of facts was ample to justify the verdict.”
“The law and the evidence being in favor thereof, the motions for a new trial are overruled.”
We concur in the above reasons assigned by the judge a quo for overruling the motions for a new trial. Finding no error in the record before us, the judgment appealed from is affirmed.
O’NIELL, J., concurs in the result